IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 26, 2007

## STATE OF TENNESSEE v. CHARLES EDWARD STANLEY

**Appeal from the Criminal Court for Cumberland County**
**No. 7783      Leon Burns, Jr., Judge**

---

**No. E2007-00300-CCA-R3-CD - Filed April 2, 2008**

---

The defendant, Charles Edward Stanley, was convicted by a Cumberland County criminal court jury of rape, a Class B felony, and was sentenced as a Range I, standard offender to nine years in the Department of Correction.  On appeal, the defendant contends that the evidence is not sufficient to support his conviction and that the trial court erred in sentencing him.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which J. CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

David Neal Brady, District Public Defender, and Joe L. Finley, Jr., Assistant Public Defender, for the appellant, Charles Edward Stanley.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William Edward Gibson, District Attorney General; and Gary McKenzie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a charge that the defendant raped the sixteen-year-old victim on January 6, 2003.  At the trial, the victim testified that her sister had been dating the defendant and that her sister and the defendant were living with her and her mother.  She said that she was on winter break from school and was at home alone with the defendant on the date of the incident.  She said her sister and mother were both at work.  She said she was sitting on a couch in the living room, watching television, when the defendant came in the room "acting strange."  She said the defendant sat very close to her and then got "on top" of her.  She said she realized something was "not right" and went to a bedroom to call 9-1-1.  She said the defendant followed her there and hung up the phone after it rang once.  She said she struggled with the defendant as he tried to remove her clothes.  She said that the defendant had her in a "choke hold" and that she grabbed a glass off the night stand and

struck the defendant on the head with it. She said this caused the defendant to release her, although the defendant was able to remove her shorts. She said she got away from the defendant and went into the living room.

The victim testified that the defendant had been "huffing" paint and was intoxicated. She said he smelled of paint and had some paint on his face. She said the paint caused him to act strangely. She said that the defendant appeared to "come to" after she hit him over the head and that he apologized to her. She said the defendant was in a bedroom while she returned to and sat in the living room and that he was able to see her from the bedroom. She said the defendant was watching her to make sure she did not call anyone. She said she was afraid to go into another room because she feared the defendant would sneak up and attack her again. She said she did not attempt to run out of the house because her closest neighbors were far away and she feared the defendant would catch her if she ran. She said she knew her mother would be home from work soon and hoped that she could keep the defendant calm until her mother arrived.

The victim said that about forty-five minutes after the initial attack, the defendant returned to the living room and approached her. She said he tried to wipe blood from her face and was acting strangely and forceful again. She said he carried her into a bedroom and shut the door behind him. She said that she stood on the bed and attempted to stay away from the defendant but that the defendant grabbed her ankles, causing her to fall onto the bed. She said the defendant removed her shorts and raped her. She said the defendant penetrated her with his penis and ejaculated inside her. She said she was "in shock" and grabbed her clothes. She said the defendant again acted like he had just "come to" and did not know what had happened. She said she went to the living room to await her mother's return from work. She feared the defendant would keep attacking her if she did not seek help because he had been "huffing" paint all day, which caused him to become aggressive.

The victim testified that her mother came home about fifteen to twenty minutes later. She said she took a shower before her mother saw her in order not to frighten her mother with the blood that was on her. She said she asked her mother to take her to see a friend and that she told the friend, Amanda Potter, that she had been raped. Ms. Potter contacted her parents, who contacted the victim's mother, who contacted police. She said she was taken to the hospital, where a "rape kit" was performed on her. She gave a statement to Investigator J. B. Wallace that night, and the police took pictures of her neck and legs.

On cross-examination, the victim testified that January 6, 2003, was the first time she was alone in the house with the defendant. She said that when the defendant first got on top of her, he began kissing her. She said that this had never happened before, that it scared her, that she tried to push the victim off of her, and that she told him "no." She said the defendant hung up the telephone she was using to call 9-1-1 and later disconnected another telephone in the house. She said the statement she gave to Investigator Wallace was true and complete. The statement said the first attack started around 4:30 and the second attack happened between 5:30 and 6:00. She said she put on her shorts, which the defendant had removed, before the second attack. She estimated that her closest

neighbor was about a quarter mile away and said that no one was living in the house across the street on that day.

The victim testified that the defendant punched her legs until she opened them and also kissed her while he raped her. She acknowledged that her statement to Investigator Wallace did not state that he punched her legs and said she might have forgotten to include everything in the statement. She said the defendant did not verbally threaten her, although he was forcibly holding her down on the bed. She testified that she had blood on her face, although she did not know the origins of that blood. She acknowledged that her sister would probably be angry with her for having sex with the defendant, but she denied that she ever had interest in a relationship with the defendant. She said she did not tell the defendant to break up with her sister in order that he could have a relationship with her. She said that the defendant was "huffing" paint in the bedroom between the two attacks.

David Hinkle testified that he was the director of the Cumberland County Central Communication Center, which received 9-1-1 calls. He was shown a computer printout of 9-1-1 calls received at the Center on January 6, 2003, and identified a call received from the victim's telephone number at 4:27 p.m. The call was noted as "abandoned before answered," meaning the caller hung up before a dispatcher answered the call. He said the record did not indicate how many times the telephone rang before it was hung up, although the call ended just one second after it reached the Center.

Rachel Patton testified that she was a registered nurse working at Cumberland Medical Center on January 6, 2003. She identified medical information obtained as part of the "rape kit' performed on the victim that evening. She said a vaginal swab was taken as part of the rape kit to determine if there had been sexual intercourse. Documents gathered as part of the rape kit indicated the victim's injuries as bruising on her neck, a bruise on her back, bruises on both knees, scratches on her lower right leg, a scratch on her upper left thigh, and a laceration on her right thumb. The victim had told her the laceration on her thumb resulted when she hit the defendant over the head with a vase. She said there was no indication of cuts or bruises on the victim's face.

Rickey Roysden testified that he was an Emergency Room nurse at Cumberland Medical Center and that he was working on January 6, 2003. He identified medical documents related to the defendant from that night. He said the defendant was brought to the hospital because of a possible overdose caused by "huffing" paint. Documents indicated that the defendant had several abrasions on his arms, shoulders, back, and nose. He also had an abrasion on his abdomen. The majority of the abrasions were on his shoulder and back. He said the defendant's blood was drawn as part of a rape kit. He said that the defendant was questioned about the assault of the victim and that the defendant said he did not remember any sexual assault. He testified on cross-examination that the only injury to the defendant's head region was a cut on his nose.

J.B. Wallace testified that he was a criminal investigator for the Cumberland County Sheriff's Department in 2003. He said he interviewed the victim on January 6, 2003, regarding a possible

rape. He said he questioned the victim and her mother in the hospital. The victim gave him a statement saying the defendant attacked her. He said that the defendant was located at the victim's residence but that he first came into contact with the defendant in the hospital, where the defendant was taken for a possible overdose.

Wallace identified photographs that he took of the victim which showed abrasions on the victim's neck and bruises on her knees. He said the photographs and injuries corroborated what the victim told him happened that night. He said that he spoke to the defendant that night and that the defendant told him he did not remember having any sexual contact with the victim. He said the defendant appeared to be intoxicated and had gold paint on his face. He said he reviewed a rape kit he received from emergency room nurses and submitted evidence to the Tennessee Bureau of Investigation (TBI) for analysis. This evidence included a bed sheet, a piece of a mattress cover, a pillowcase, and a sexual assault collection kit. Other evidence collected included the defendant's underwear and t-shirt. He identified a photograph of a blood stain from a bed in the victim's house and broken glass on the floor in the bedroom where the victim alleged she was raped.

On cross-examination, Wallace testified that he went to the victim's house and could not recall how close her neighbors were. He said the victim did not tell him that the defendant beat on her legs, although he saw bruises on her knees. He said that he did not recall interviewing the victim's sister and that he interviewed the victim one time.

Agent Charles Hardy of the TBI Crime Laboratory testified that he worked in the serology and DNA unit and specialized in examining physical evidence for the presence of body fluids and other items containing DNA. He identified a report he prepared in connection with this case. The report indicated that a vaginal swab taken from the victim contained DNA matching the victim and the defendant.

The jury found the defendant guilty of rape.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is not sufficient to support the conviction because the victim was not a credible witness. The state counters that assessing the credibility of witnesses was within the jury's purview and that the evidence is sufficient to support the finding of guilt. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding

witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In the present case, the defendant was convicted of rape, which is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by one of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual penetration is accomplished without the consent of the victim . . . ." T.C.A. § 39-13-503(a). The victim testified that the defendant had sexual intercourse with her forcibly and against her will. The defendant challenges the credibility of the victim by noting that the victim did not attempt to escape from the house and did not immediately reveal the crime; that physical evidence contradicted her testimony that she hit the defendant over the head with a glass vase; and that her testimony was "so riddled with contradictions and falsehood that it raises a reasonable doubt as to the guilt of the defendant." However, as the state points out, it is the jury's task to determine the credibility of the witnesses, and we do not second-guess credibility determinations on appeal. Furthermore, other evidence presented at the trial corroborated the victim's testimony, including records of the 9-1-1 call that she testified she made when the defendant initially attacked her and bruises on her that indicate a struggle occurred. This evidence counters the defendant's defense at trial that the intercourse was consensual. The state presented sufficient evidence to prove beyond a reasonable doubt that the defendant raped the victim.

## II. SENTENCING

At the sentencing hearing, Danny Williams with the Board of Probation and Parole testified that he prepared an investigative report on the defendant. He stated that the defendant had twelve prior adult convictions, including five for assault, four for inhaling paint, two for resisting arrest, and one for underage drinking. He noted that five of these convictions, including three assaults, involved one incident that happened on January 30, 2002. The defendant's most recent arrest was on February 12, 2002. The assaults were all assaults on officers that stemmed from the defendant's inhaling paint offenses. The defendant was twenty-five years old at the time of the sentencing hearing in July 2006 and was employed at Lifetime Recovery Community. Mr. Williams noted positive things the defendant's employers said about the defendant.

Dale Nargenah testified that he was the founder and manager of Lifetime Recovery Community, which he said was a "recovery housing community" that used the twelve-step recovery method. He said the community had about 100 residents and included recovery meetings, employment referral services, and work shuttle services. He said the defendant first came to the community shortly after the rape incident occurred. He said the defendant was discharged from the psychological ward at a hospital to the community. He said the defendant had not "huffed" paint since that time. He described the defendant as young and immature when he first arrived at the community but said the defendant had made substantial progress since then. He said the defendant became a leader in the community and requested to be a resident staff member after a year. Mr. Nargenah said the defendant never exhibited a problem with women or substances while in the community. He said the defendant had learned to take responsibility for his actions, although he

acknowledged that the defendant did not tell him that he was being questioned in connection with a rape when he arrived at the community. He said the defendant did tell him that "a situation" had taken place in Crossville and that the defendant was not sure what would come of it.

The defendant's mother, Debbie Fuller, testified that before the rape incident, the defendant frequently "huffed" paint. She said she received a call in January 2003 that the defendant was in the hospital as a result of an overdose and that she could barely recognize the defendant at that time because of the effects of the paint. She said the defendant had changed since entering the recovery community and that he had received his GED and scholarship offers. She said the defendant at the sentencing hearing was not the same man he was three to four years previously.

Several residents of the Lifetime Recovery Community attended the sentencing hearing in support of the defendant. One resident, Brian Dale Carter, testified on behalf of the group that the defendant was "not a criminal," and that the defendant had shown no problems socializing with people and interacting with women. He said the defendant's prior actions could be explained by the defendant's substance abuse.

The defendant took the stand against the advice of counsel and stated that he had dedicated his life to helping people in the past three years. He said he sought to make amends for his past mistakes, although he denied raping the victim. He said he was not a person who would hurt people, especially women or children.

In sentencing the defendant, the trial court stated that it was placing weight on the defendant's history of criminal convictions. See T.C.A. § 40-35-114(2) (2003). The trial court also said it would place less weight on the enhancement factor that the defendant committed the offense to gratify his desire for pleasure or excitement. See id. § 40-35-114(8). The trial court found that two mitigating factors had "some bearing" on the case: that the defendant, because of youth or age, lacked substantial judgment and that the circumstances of the offense were so unusual that it is unlikely a sustained intent to violate the law motivated the criminal conduct. See id. § 40-35-113(6), (11). The trial court sentenced the defendant to nine years in the Department of Correction.

On appeal, the defendant contends that the trial court erred in sentencing him to nine years. He argues that the trial court improperly enhanced his sentence above the presumptive minimum sentence in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). He also argues that the trial court did not apply relevant mitigating factors. The state counters that the defendant waived the Blakely argument but that the sentence is proper nonetheless because it was based on the defendant's prior record and the trial court did consider mitigating factors.

We first address the defendant's Blakely argument. In that case, the U.S. Supreme Court held that any fact, other than a prior conviction, which is used to enhance a defendant's sentence beyond a statutory minimum sentence must be found by a jury beyond a reasonable doubt. Blakely, 542 U.S. at 301; see also Apprendi v. New Jersey, 530 U.S. 466, 489, 120 S. Ct. 2348 (2000). In State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007) ("Gomez II"), our supreme court held that Blakely

applied to Tennessee's pre-2005 sentencing law, to the extent that it allowed a judge to enhance a sentence beyond a presumptive minimum based on judicially-determined facts other than a prior conviction. See also Cunningham v. California, _ U.S. _, 127 S. Ct. 856 (2007). Prior to this, our supreme court had held that Blakely did not apply to Tennessee's pre-2005 sentencing law. State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), ("Gomez I"), vacated and remanded by Gomez v. Tennessee, _ U.S. _, 127 S. Ct. 1209 (2007).

This court has held that, notwithstanding Gomez I, a defendant's failure to raise the Blakely issue in the trial court constitutes a waiver of that issue and the defendant is entitled to relief only under "plain error" review. State v. John William Matkin, III, No. E2005-02946-CCA-R3-CD, Sevier County, slip op. at 13 (Tenn. Crim. App. Nov. 19, 2007), app. filed (Tenn. Jan. 18, 2008). Rule 52(b) of the Tennessee Rules of Criminal Procedure provides:

> (b) Plain Error. - When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

See T.R.A.P. 36(b). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

In the present case, the record establishes what transpired in the trial court, and a clear and unequivocal rule of law affecting the defendant's Sixth Amendment right to a trial by jury was breached when the trial court considered a sentencing enhancement factor other than prior convictions. There is no indication that the issue was waived for tactical reasons. However, plain error relief is not appropriate in this case because consideration of the trial court's error is not necessary to do substantial justice. The trial court stated that it was not placing great weight on factor (8) but did place significant weight on the defendant's criminal history. The defendant's sentence was enhanced one year above the presumptive minimum, and given the defendant's

criminal history, which involves twelve prior convictions, and the trial court's statements that it was not placing significant weight on the other considered enhancement factor, we conclude that consideration of this issue is not necessary to do substantial justice.

We next consider the defendant's argument that the trial court erroneously arrived at the nine-year sentence by not applying mitigating factors. Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B, C, D, or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c) (2003). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

The record reflects that the trial court considered relevant facts and circumstances. Although the defendant argues that the trial court ignored mitigating factors, such as the defendant's rehabilitation progress and reputation at Lifetime Recovery Center, the record reflects that the trial court did consider these. The trial court stated that it was taking into account the witnesses who came to court to testify in support of the defendant and noted that the defendant had shown a "different side" of his life in the recovery program. The trial court further stated that it found mitigating factors (6) and (11) to be of some relevance. However, the court also found significant the defendant's criminal history, which included assaults related to inhaling paint, similar to the current offense. Even if the trial court had not applied any weight to factor (8), the sentence of nine years, one year above the presumptive minimum, would be appropriate. The defendant is not entitled to relief on this issue.

## CONCLUSION

We conclude that the evidence is sufficient to support the conviction of rape and that the trial court did not err in sentencing. Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE